UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI AT ST. LOUIS

| | |
|---|---|
| George "Michael" Halley, as DURABLE POWER OF ATTORNEY for, LORETTA DAVIS <br> <u>Address:</u> 3000 Riverwood Dr, St Charles, Missouri, 63303 <br><br> Plaintiff(s), <br><br> v. <br><br> WINDSOR ESTATES OF ST CHARLES SNAL LLC <br> <u>Serve Registered Agent:</u> <br> Howe, Nelson H. II <br> 714 Locust Street <br> Saint Louis, MO 63101 <br><br> Defendant(s). | Case No. <br><br> Division No. <br><br> JURY TRIAL DEMANDED |

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

The Plaintiffs, by and through undersigned counsel, submits this Petition for Damages against the above-named Defendant(s), and in further support, states and alleges as follows:

**PLAINTIFF**

1. George "Michael" Halley, is the Durable Power of Attorney for Loretta Davis ("Resident") who suffered abuse and physical injury on August 17, 2021 during an improper transfer conducted by Defendant's employee and /or agent LaShonda Williams at Windsor Estates, located at 2150 West Randolph Street Saint Charles, MO 63301, a Missouri skilled nursing facility. ("The Facility).

2. The DPOA for Loretta Davis empowers Plaintiff to bring this suit pursuant to the following provision stating:



> 6. Agent is specifically given authority to commence any litigation for and on behalf of Principal or to continue any litigation for and on behalf of Principal. Agent is specifically given the power to prosecute or defend claims, including the right to settle matters and grant releases. Agent is specifically given the authority to employ or discharge attorneys and to make binding arrangements on behalf of Principal.

## DEFENDANT

3. Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

4. At all times relevant, Windsor Estates of St. Charles Snal, LLC was a Missouri limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as Windsor Estates ("Facility" or "the Facility") which is a Missouri licensed nursing home.

5. The LLC members of Windsor Estates of St. Charles Snal, LLC are Elisha and Yael Atkin, each of whom are residents of Illinois.

6. Facility was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility

7. Consequently, Facility, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

## JURISDICTION AND VENUE

8. Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:



9. A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in this District, thereby making venue proper in this Court.

10. Therefore, Plaintiff brings his claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

## AGENCY

11. Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

12. The acts hereinafter described were performed by the agents, representatives, servants, and employees of Defendant and were performed either with the full knowledge and consent of Defendant, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the Defendant.

13. Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of Defendant were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.

## FACTUAL BACKGROUND

14. Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:



*Filing of Steele Chaffee*

3

### Defendant's Treatment of Resident

15. On August 18, 2021, Facility employee Lashonda Williams transferred Resident in an aggressive manner. Video of the incident evidences the Resident say "ow" several times and Resident sustained bruising to both arms and skin tear to the left elbow.

16. The Facility was issued a Statement of deficiencies on October 6, 2021.

17. The Police Report regarding the incident states in relevant part:

On August 29, 2021, at 1249 hours I was dispatched to 2150 W. Randolph St. (Windsor Estates Retirement Community)in reference to elder abuse. Upon my arrival, I made contact with the Assistant Director of Nursing Stephanie Jeffers. Jeffers stated she was contacted by a resident's son, George "Michael" Halley, about his mother Loretta Davis being abused by a staff member of the facility. Jeffers stated Halley sent her a video of Davis being abused by a nurse later identified as Lashanda Wil1iams. Jeffers showed me the video of the incident. The video shows Williams attempting to help dress Davis on Davis' bed. Davis was laying on her back on the bed while Williams tried to put Davis' pants on. Williams gets Davis' pants pulled halfway up then grabs a chair and moves it next to Davis' bed. Williams is heard telling Davis to sit up. Davis replies by saying she cannot. When Davis would not sit up, Williams jerked Davis up by the back of her neck to a seated position. Williams told Davis to put her arms in her shirt. When Davis did not put her arms in the shirt, Williams forcefully grabbed Davis' arm right arm and put it in the shirt. Davis can be heard verbally expressing pain by saying "ow". Williams did the same thing with Davis' left arm. Williams picked up Davis under the arms and threw Davis into the chair mentioned above. Davis tried to grab onto Williams and Williams slapped Davis' hand away twice. Davis can be heard again saying "ow" several times out of pain. The video ends with Davis crying due to the incident. Jeffers said according to Halley this incident occurred on 8/17/2021 in the morning hours. Jeffers also stated Williams was suspended already for an unrelated incident. Jeffers contacted Brianna with department of senior services and filed an abuse report.

I contacted Halley directly for information about Davis. Halley stated Davis has severe Dementia and multiple other health conditions. Halley stated he was the power of attorney for Davis and made all her decision for her. Halley said his sister, Linda Halley, visited Davis on 8/17/2021 and was told she could not be in the room while Williams dressed Davis. Linda put her phone on record and left it in the room while she waited down the hall for Davis to be dressed. Michael advised Linda sent him the video and told him he needed to do something about it. Michael emailed the video to the staff of Windsor Estates. The video was uploaded to evidence.com through the citizen share function by Jeffers.



4

I contacted Linda directly to have her upload the video directly to evidence.com through the citizen share function. Linda uploaded the original video herself to evidence.com. I tried to contact Williams via phone several times and was unable to contact her. Williams was entered as wanted in relation to incident under reference #W55082774. This incident was recorded on my BWC

On 09/02/2021 I was assigned the follow-up and investigation for the original assault. I began my investigation by first reaching out and making contact with the victim's son and "power of attorney" Michael Halley to inform him that I was the assigned investigator, and inquire if there was additional information not known at the on-set of the incident.

Michael verified that his sister Linda Halley provided the video which was recorded on 08/17/21 as stated in the original report. He also explained that as soon as he saw the video he was disturbed and notified Windsor personnel.

I contacted Kelly Arnold LNHA (License Nursing Home Administrator) who reiterated the statements and actions made by Michael and his sister. She also informed me that the known suspect, Lashonda Williams CNA (Certified Nursing Assistant) was suspended previous to 08/17/21 for a separate "rough" incident where Lashonda told the resident she "Wasn't helping enough" during her attempting to clean her. The resident complained that she was handled to hard and Lashonda told her "That is what you get for being uncooperative". Arnold documented that she spoke with Lashonda on 08/20/21 and told her she was suspended pending an investigation. Lashonda was then terminated on 08/25/21 prior to the report and notification by Michael Halley about his mothers incident. The documentation by the DHSS (Department of Health and Senior Services) Region 5 will be attached to this report along with internal paperwork from Windsor Estates.

As the original report highlighted the incident being investigated by this agency regarding Loretta Davis was not discovered and reported till well after the first incident described and documented above. Based on what we know the Davis incident is not the first allegation of rough treatment by a resident on Lashonda.

On 09/04/2021 I reached out to Lashonda with the phone number provided by Windsor with negative result. I left a voice mail and requested she return the call. On 09/08/21 Lashonda returned my call and I explained the reason for P.D. involvement, requesting she come in voluntarily to speak with me about the allegations. Lashonda repeatedly told me that she has no idea why I was interested in talking to her and that she was already suspended from her job at Windsor Estates.



Lashonda showed up at police headquarters on 09/10/21 at approximately 11:00 without notice and requested to speak with me. I met her down in the lobby and escorted her to our Criminal Investigations Bureau to speak about the allegations made by the victim's family and Windsor. The whole time I escorted her I showed her the pathway back to the lobby and explained and reiterated that she was not under arrest, free to leave at any time, and at the police headquarters voluntarily. Lashonda acknowledged our conversation more than once agreeing with my statements relative to her cooperation.

At 11:07 Lashonda and I stepped into interview room #2 leaving the doors open to and from the interview room, bureau, and then down to the lobby with a clear pathway out. Once again, I verified if she was here voluntarily and she stated she was.

I began interviewing Lashonda by inquiring about what she knew was going on with the allegations from Windsor Estates and she explained that she did not. Lashonda stated that she had been on vacation in Miami, Florida and was off the whole month of August. She left on the 2nd or 3rd and stayed gone the whole month. Lashonda also told me that she had only been employed at Windsor for about 3 months. Lashonda explained that a representative called her when she was out of town on 08/11/21 and explained to her that she was being suspended for not wearing a mask, or not wearing the mask correctly.

I tried clarifying that she was off the whole month, but she then told me that she went back for one day and was suspended again. Lashonda's own text messages indicated that she was called to the office on 08/19/21 while at work and further stated she had been there a couple days prior. Lashonda stated she did not even work the whole month but I am learning that Windsor had her return to work because they were short of personnel on 08/17/21 which she verified by looking at her schedule. Lashonda said, "That was a scheduled day".

I asked Lashonda if she knew victim Loretta Davis and she said she did. I asked Lashonda to watch the video I recorded on my phone taken from evidence.com. As the video started I asked Lashonda if she was depicted in the video and she said "Yes". I then asked her about her actions during the video first with grabbing the back of Loretta's neck and aggressively forcing her to sit up by pulling the back of her neck. Lashonda told me, "That's not normal", referring to her actions related to the Loretta's neck. I asked Lashonda if it was normal to throw residents in chairs from the bed to the chair violently. The whole time Loretta wincing, and yelling "Ow"! I asked Lashonda if it was normal and she told me "No, I didn't use my gate-belt to help lift Loretta to the chair". She also made a comment that Loretta is "So Stiff" insinuating that being stiff is an excuse to handle residents like she had.



6

> Lashonda admitted to me that she was in the video and working that day (08/17/21). Lashonda told me again, "That's not the proper way that I do that first" "I needed my gate-belt". Lashonda told me that she has never had any complaints leading up to this incident, but previously told me that she was suspended blaming the suspension on a mask. Her version is much different than the account Windsor provided. I informed Lashonda that part of my job is to inform the DHSS and the Missouri CAN Registry, which I had previously. I asked Lashonda if what we saw was normal when dressing a resident/elderly person and she said, "No" "No, you know that"! Lashonda admitted she should not have handled Loretta. the way she did and that her actions were wrong. Lashonda did say that Loretta grabs "a lot". She said that Loretta "resists" and is not easy to dress. Lashonda even told me that her hair was tied up so Loretta would not grab it. I asked Lashonda if Loretta is normally aggressive and she said she is not. Lashonda told me that this might have been the first time she worked with Loretta, but she sure seemed to know a lot about her with limited interactions. As we drew to a close in the interview Lashonda seemed remorseful, but at the same time questioned how serious her actions were. Lashonda told me that she was thankful that I showed her the video so she can correct herself.
>
> The interview ended and I escorted her to the lobby even though she previously knew the way per my direction
>
> At this time I am not going to interview the victim based on her diagnosis with dementia and her current state of health.
>
> Heather Keen RN Facility Advisory Nurse II is the investigator for DHSS
>
> Her information will be in the additional party portion of this report.
>
> Based on the video evidence, Lashonda's admission, and the previous allegations this case will be forwarded to the St. Charles County Prosecuting Attorney's Office.

18.     Thus, the only reason Lashonda Williams was working at the Facility on August 17, 2021, was because it was short staffed.

### Management of the Facility

19.     Most skilled nursing homes substantially derive their revenue and profits from the receipt of taxpayer dollars through the federally funded Medicare program.  Under Medicare, residents with higher acuity levels, i.e., a greater number and greater degree of illnesses, place higher demands for care and services on the facility and its staff.


*Filing of Steele Chaffee*

7

20. The rate at which the skilled nursing facilities accepting Medicare dollars for the delivery of nursing care and services, and according to the amount of their ultimate revenue and profits, are normally based upon the acuity level of the residents confided to their facilities. Thus, the higher overall and/or average acuity a facility has, the higher their reimbursement rates will be in general.

21. For purposes of reimbursement, acuity, the amount of care a resident requires, is measured using a process established by The Center for Medicare Services ("CMS").

22. This process includes a detailed Resident Assessment Instrument, completed by the facility for each resident as varying intervals depending on the resident's circumstance.

23. The RAI form is known as a "MDS" (Minimum Data Set) and must be certified to CMS by a registered nurse on behalf of the facility.

24. A completed MDS contains extensive information on a resident's nursing needs, activities of daily living impairments, cognitive status, behavioral problems, and medical diagnoses. This information is used to slot the resident into a RUG/PPDM.

25. MDS's are required to be prepared for each resident of a skilled nursing facility when they initially arrive at the facility and periodically after that depending on the course of the resident's medical progression. At a minimum, an MDS is to be prepared for every resident in a skilled nursing facility on a quarterly basis.



26. The completion of an MDS by a skilled nursing facility is a part of the federally mandated process for clinical assessments of all residents in nursing facilities. It is a core set of screening, clinical, and functional status elements reported on all residents of nursing facilities regardless of who is paying for the resident's stay in the nursing facility.

27. MDS's need to be as detailed and comprehensive as possible so that they reflect all the needs of each of the residents in the nursing facility.

28. When done properly, the MDS provides a comprehensive assessment of each resident's functional capabilities and helps nursing facility staff identify all the health problems of each of their residents.

### Cost Reporting & Staffing Information

29. Nursing facilities, like the Facility, are required to submit an annual "Cost Report" to CMS, known as "CMS Form 2540-10". The cost report is a financial report that identifies the cost and charges related to healthcare treatment activities in a particular nursing facility.

30. Included with the cost reports are extensive details as to how much money the nursing facility spent on RNs, LPNs, and CNAs. The cost reports reflect the patient census, hours paid, and the hourly rate that the nursing facility paid each category of direct caregivers.

31. By dividing the paid hours by the patient census in the facility it is possible to determine how many hours the nursing facility paid for each category of direct caregivers per resident per day for the time covered by that cost report. This number is referred to as the "reported HPPD".



32. CMS allows the facilities to include all paid hours in the "reported HPPD." Thus, that number does reflect true direct care hours, but is inflated because "hours paid" includes sick pay and vacation pay both of which reduce the amount of actual HPPD provided by caregivers to residents in nursing facilities.

33. The Facility was also required to report quarterly staffing information through the CMS "Payroll Based Journal" (PBJ) program.

34. To determine more accurate direct-care hours, it is necessary to examine the data that nursing facilities use to track the number of hours their employee's work. This information is easily accessed through reports that are commonly referred to as "Time Detail Reports", "Punch Detail Data Reports", or some other similarly named report depending on the time-keeping system used by the nursing facility.

35. The more detailed Punch Detail or time records will note vacation or sick time paid and thus, reveal actual hours worked in the facility. This information reveals a more accurate direct care number and allows the calculation of the actual HPPD for any period including a year, a quarter, a month, or a day.

Corporate Malfeasance

36. Defendant consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.



37. Accordingly, Defendant, by their operational choices and decision making, and to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

38. These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Missouri and federal government imposed upon Defendant and the Facility.

39. Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at the Facility including Resident, failed to receive even the most basic care required to prevent abuse and injury.  This negligence caused the Facility permit LaShonda Williams to work on August 18, 2017 and caused Resident's injuries as described above.

40. During Resident's residency at the Facility, Defendant negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe, and protective environment, and that, as a result of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.

## COUNT I
### Missouri Omnibus Nursing Home Act Claim Against Defendant

41. Plaintiff incorporates by reference herein the allegations previously set forth and further alleges as follows:



42. The cause of action set forth in this Count I is brought under the Omnibus Nursing Home Act, Mo. Rev. Stat. § 198.003, et seq., and more specifically by reason of statutorily created private cause of action pursuant to Mo. Rev. Stat. § 198.093.

43. As the owners and operators – and agents of owners and operators – of an assisted living facility licensed by the State of Missouri, Defendant were at all times material hereto subject to the provision of the Omnibus Nursing Home Act, Section 198.003, et seq

44. On September 13, 2021, Plaintiff filed a written complaint with the Office of the Attorney General for the State of Missouri against the owners, operators and agents of the owners and operators of Facility making allegations regarding deprivations by Defendant causing injury to Plaintiff. This complaint was filed within 180 days of alleged the deprivation occurring on August 17, 2021

45. The Office of the Attorney General for the State of Missouri declined to initiate legal action within sixty days of receiving this complaint.

46. Plaintiff filed this civil action against the owner, operator and/or the agents of Facility within two hundred forty days of filing the complaint with the Office of the Attorney General for the State of Missouri

47. During her residency at Facility, Plaintiff was subject to abuse and neglect at the hands of Defendant and their agents, servants and/or employees as stated above.



48. Specifically, during the course of their care and treatment of Resident, Defendant and their agents, servants and/or employees breached their duties and were guilty of the following acts of negligence and carelessness by failing to measure up to the requisite standard of due care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including:

   a. By failing to timely, consistently, and properly assess and document Resident's physical condition;

   b. By failing to provide adequate supervision and/or intervention to address Resident's risk of suffering abuse and an improper transfer and responding to Resident's abuse and improper transfer;

   c. By failing to properly supervise and train the employees, agents and/or servants of the Defendant who were responsible for the care and treatment of Resident;

   d. By failing to provide competent and qualified staff;

   e. By failing to provide adequate training to staff regarding the prevention of abuse and improper transfer and responding to abuse and improper transfer;

   f. By failing to provide adequate supervision of staff regarding the prevention of abuse and improper transfer and responding to abuse and improper transfer;

   g. By failing to provide adequate assistive devices to prevent injuries;

   h. By failing to enact and carry out an adequate care plan in regard to RESIDENT's risk for abuse and improper transfer;

   i. By failing to timely report to a physician changes in the condition of RESIDENT;

   j. By failing to adequately, timely and consistently prevent, assess, and treat RESIDENT's risk for abuse and improper transfer;

   k. By failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment and treatment of resident at risk for abuse and improper transfer;



    l.    By failing to carry out and follow standing orders, instructions and protocol regarding the prevention of abuse and improper transfer and responding to abuse and improper transfer; and

    m.    By failing to have a sufficient number of staff.

49.    The aforementioned abuse and neglect by Defendant and their agents, servants and/or employees was physically and mentally tortuous causing great physical pain and suffering and emotional distress to RESIDENT requiring her to seek medical treatment and incur medical expenses.

50.    The aforementioned abuse and neglect occurred in violation of the Omnibus Nursing Home Act, § 198.088, declaring that, "1. Every Facility, in accordance with the rules applying to each particular type of Facility, shall ensure that: (1) There are written policies and procedures available to staff, residents, their families or legal representative and the public which govern all areas of service provided by the Facility . . . (2) Policies relating to admission, transfer, and discharge of residents shall assure that: . . . (b) As changes occur in their physical and mental condition necessitating service or care which cannot be adequately provided by the Facility, residents are transferred promptly to hospitals, skilled nursing facilities, or other appropriate facilities; . . . (6) Each Resident admitted to the FacilitY: . . . (g) Is free from mental and physical abuse . . . (i) Is treated with consideration and respect, and full recognition of her dignity and individuality, Including privacy and treatment In caring for her personal needs . . .

51.    Resident was a member of the class of persons intended to be protected by the enactment of the aforementioned statutes.



14

52. The injuries sustained by Resident were the type of injuries that the regulations were enacted to prevent.

53. As a direct and proximate result of the Defendant's failure to fulfill its responsibility of care and protection to Resident as imposed by the aforementioned statutes attendant to Defendant's privilege of ownership and operation of a nursing home business, Resident suffered severe pain, anxiety, mental distress and medical expense. Additionally, Resident was required to undergo treatment for her injuries and incurred expenses for her medical care.

54. The actions of defendant were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendant is liable for punitive damages for their grossly negligent care of Resident.

55. At the time defendant caused and allowed Resident's abuse, they knew that their conscious disregard to provide adequate staff; train, and/or supervise their agents, servants and/or employees during 2021 created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

56. Accordingly, defendant showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against defendant in an amount that is fair and reasonable and will punish defendant and deter them and others from similar conduct.



57. As a direct and proximate result of Defendant's negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; and other damages.

58. The aforementioned actions and omissions were intentional, willful, malicious, and outrageous, entitling Resident to an award of punitive damages pursuant to Section 198.093(3).

59. Plaintiff is entitled to an award of punitive damages and reasonable attorneys' fees pursuant to Section 198.093(3).

WHEREFORE, Plaintiff prays for judgment against Defendant for a sum that a jury determines to be fair and reasonable, for actual damages together with the costs and expenses herein occurred, punitive damages, attorney's fees and for such other relief as this Court deems just and proper.

## COUNT II
### Declaratory Judgment

60. Upon information and belief, the Residency Agreement signed by Plaintiff contains an arbitration provision.

61. Upon information and belief, the Arbitration Agreement states that Arbitrator's fees and costs associated with the arbitration shall be divided equally among the parties to the underlying residency agreement and the parties shall bear their own attorneys' fees and costs in relation to preparation for and attendance at the arbitration hearing.

62. Upon information and belief, the Arbitration Agreement, the Arbitration Agreement precludes any award of punitive damages.



16

63. Plaintiff seeks a declaratory judgment herein pursuant to FRCP 57; 28 U.S. Code § 2201 and RSMo § 527.020., that the arbitration agreement is legally unenforceable and invalid in its entirety because it deprives Plaintiff of certain rights and remedies and articulated public policy as set forth under Missouri law in The Omnibus Nursing Home Act ("the Act"). Mo. Rev. Stat. § 198.003 et seq.

64. The Missouri Supreme Court has recognized that "[o]ne of the key purposes of the Act is to provide protection to those individuals who are unlikely, or unable, to protect themselves. *Bachtel v. Miller Cnty. Nursing Home Dist.*, 110 S.W.3d 799, 801 (Mo. 2003).

65. The Act was fashioned as a response to public concerns about elderly residents of nursing homes and the inadequacy of state laws and regulations governing nursing home facilities. *Id.* at 802. The Act provides a private cause of action for residents and the estates of deceased residents against nursing homes which violate the rights of residents.  RSMo § 198.093; *see also Bachtel*, 110 S.W.3d at 801; *Stiffelman v. Abrams*, 655 S.W.2d 522, 529-30 (Mo. banc 1983).

66. The statutory cause of action provides for recovery of "actual damages," as well as punitive damages and attorney's fees.  *See* RSMo § 198.093.3.

67. In addition, the Act includes a residents' "bill of rights" and provides that residents are to be "free from mental and physical abuse" and must be "treated with consideration, respect, and full recognition of [their] dignity and individuality[.]".  *See Id.* at § 198.088.

68. The Arbitration Agreement - based on information and belief - requires each party to bear its own attorney's fees and costs contrary to the provisions of the Act which allow for an award of attorney's fees and costs to the prevailing party. *See* RSMo § 198.093.3.



69. The restrictions set forth in The Arbitration Agreement - based on information and belief - compromise the ability of nursing home residents and their families – including Plaintiff – to protect themselves and to vindicate the rights to be "free from mental and physical abuse" and "treated with consideration, respect, and full recognition of [their] dignity and individuality" recognized as important public policies under the Act. See Mo. Rev. Stat. § 198.088.

70. Taken together, these elements of The Arbitration Agreement - based on information and belief - effectively deprive Plaintiff and Resident of rights and remedies guaranteed under by the Act and vitiate the very protections of the Act.

71. An actual controversy exists between the parties as because The Arbitration Agreement - based on information and belief - itself purportedly prohibits the filing of Count I in this Court that would otherwise have jurisdiction over it.

72. This Court is authorized by Rule 87.02 and RSMo § 527.020 to declare the rights and liabilities of the parties.

73. Plaintiff has no adequate remedy at law.

74. Plaintiff has incurred costs, including attorney's fees, and as a result of this action, is entitled to seek an award of compensation of said costs and attorneys' fees.

WHEREFORE, Plaintiff prays this Court enter judgment declaring that The Arbitration Agreement - based on information and belief - is unenforceable because it is "so prohibitive as to effectively deprive a party of his or her statutory rights," under the Act; and for Plaintiff's costs and attorney's fees expended herein; and for such other and further relief as the court may deem necessary and proper.



18

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

        Respectfully Submitted,

        STEELE CHAFFEE, LLC

        By:   */s/ Jonathan Steele*
        Jonathan Steele  MO #63266
        Kevin Chaffee    MO #63462
        2345 Grand Boulevard, Suite 750
        Kansas City, MO 64108
        Ph: (816) 466-5947
        Fax: (913) 416-9425
        jonathan@nursinghomeabuselaw.com
        kevin@nursinghomeabuselaw.com

**CERTIFICATE**

I hereby certify that the below-signed Attorney signed the original of the above and foregoing and is maintaining the original copy at said Attorney's office.

*/s/ Jonathan Steele*
Attorney for Plaintiff(s)

